## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-1830-SBP

SALIMA JANDALI,

      Plaintiff,

v.

SWIFT BEEF COMPANY,

      Defendant.

---

## AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Salima Jandali, through her counsel Tyrone Glover, Helen Oh, and Genevieve Mesch of Tyrone Glover Law, respectfully alleges for her Complaint and Jury Demand as follows.

## I.     INTRODUCTION

1. This case presents a disturbing example of systematic workplace discrimination and retaliation against Plaintiff Salima Jandali, a Muslim woman and Moroccan immigrant who refused to participate in her employer's illegal, dangerous, and exploitative practices.

2. Ms. Jandali worked as a safety trainer at JBS, one of America's largest meatpacking facilities, where her job was critical to preventing serious workplace injuries and deaths. Despite her exemplary performance, Ms. Jandali faced severe religious, ethnic, and racial harassment from her supervisor, Ms. Romero, who routinely called her slurs while discarding her safety equipment when she was not around.

3.      When Ms. Jandali's father suffered a medical emergency requiring heart surgery, she properly requested and received approval from Human Resources for Family and Medical Leave Act protection. Despite this approved protected leave, Ms. Romero wrongfully terminated Ms. Jandali's employment, falsely claiming no paperwork had been submitted. Although Ms. Jandali was eventually reinstated after her union filed a grievance with supporting documentation, JBS continued its retaliation by systematically denying her access to essential work systems, training materials, and even her email for over six weeks upon her return.

4.      The discrimination and retaliation escalated even further when JBS supervisors systematically pressured Ms. Jandali to falsify mandatory safety training records. This illegal practice directly endangered production employees—many of whom were immigrants who did not speak English and needed interpreters to understand critical safety procedures, yet JBS refused to provide adequate language support. Workers suffered serious injuries, including losing fingers and limbs due to inadequate safety training, however JBS continually prioritized production over worker safety.

5.      After Ms. Jandali's repeated complaints to management and refusals to commit illegal acts, JBS escalated its retaliation by interrogating Ms. Jandali in front of the very supervisors she raised complaints about, physically damaging her workplace locker, and desecrating her Islamic prayer beads. Despite multiple attempts to address these violations and the escalating harassment against her, JBS failed to take any corrective action and instead forced her constructive discharge.

6.      Ms. Jandali now brings this action seeking redress for violations of the Colorado Public Health Emergency Whistleblower Act, wrongful discharge in violation of public policy, religious, racial, and ethnic discrimination and retaliation under Title VII of the Civil Rights Act of 1964 and the Colorado Anti-Discrimination Act, and interference with and retaliation for exercising her rights under the Family and Medical Leave Act.

## II.    JURISDICTION AND VENUE

7.      This action is brought under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e; Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2617; the Colorado Anti-Discrimination Act ("CADA"), C.R.S. § 24-34-402; and the Colorado Public Health Emergency Whistleblower Act ("PHEW"), C.R.S. § 8-14.4-104.

8.      Jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Jurisdiction supporting Plaintiff's claims for attorney's fees and costs is conferred by 42 U.S.C. §§ 2000e-5(k); 29 U.S.C. § 2617; C.R.S. § 24-34-405, and C.R.S. § 8-14.4-106.

9.      Venue is proper under 28 U.S.C. § 1391(b) because the practices alleged to be unlawful occurred in the District of Colorado.

## III.    PARTIES

10.     Plaintiff Salima Jandali was a resident of and domiciled in the State of Colorado. At all relevant times, Plaintiff was employed by Defendant and worked at the Greeley, Colorado meat processing facility.

11.     Defendant JBS is a Brazilian multinational food company and the world's largest meat processing enterprise. JBS USA Food Company is a wholly owned subsidiary of JBS incorporated in Delaware, with its headquarters and principal place of business at 1880 Promontory Circle, Greeley, Colorado. At all relevant times, Defendant JBS was an "employer" within the meaning of Title VII and Colorado law.

### IV.     ADMINISTRATIVE PREREQUISITES

12.     Plaintiff timely filed a Charge of Discrimination with the Colorado Civil Rights Division, the U.S. Equal Employment Opportunity Commission, and the and Colorado Division of Labor Standards and Statistics. This Complaint timely follows Plaintiff's receipt of notices of right to sue. Thus, all administrative prerequisites have been met.

### V.     FACTUAL ALLEGATIONS

13.     Ms. Jandali was born in Morocco and moved to the United States when she was a child. She has a Bachelor of Arts degree in Political Science and Anthropology from the University of Northern Colorado. She is fluent in English, Arabic, and French.

14.     Ms. Jandali began her employment with JBS on August 14, 2019, as a classroom trainer at Defendant's Greeley, Colorado beef processing plant. Her job duties included conducting mandatory safety training for new hires and production employees working with equipment on the meat processing floor.

15.     Ms. Jandali's role was critical to workplace safety, as training was essential to preventing serious workplace injuries and potentially fatal accidents in the facility.

16.    JBS beef plant workers were scheduled to work either A, B, or C shift. Ms. Jandali worked full-time on B Shift, which was from 2:00 p.m. to 10:30 p.m.

17.    Ms. Jandali was a member of the United Food and Commercial Workers Union, Local 7.

18.    Ms. Jandali performed her job responsibilities satisfactorily and professionally at all relevant times.

### A.  Ms. Jandali Experienced Severe and Blatant Harassment by Supervisor Romero

19.    In 2023, Training Manager Hannah Romero became Ms. Jandali's supervisor. Ms. Jandali experienced severe harassment from Ms. Romero based on her religion, ethnicity, race, and national origin.

20.    On a regular basis throughout the year, Ms. Romero belittled Ms. Jandali and used religious slurs against her, often calling her a "stupid Muslim" or "stupid Arab." She would speak to Ms. Jandali condescendingly and disrespectfully, telling her to "do her damn job" when she asked questions.

21.    Ms. Romero's harassment escalated as the year progressed. She engaged in repeated degradation and intimidation of Ms. Jandali by throwing away Ms. Jandali's essential safety equipment of her work boots and hard hat, which she kept in the same place on the staff locker room floor. On at least 25 occasions, Ms. Jandali arrived to work to find her safety equipment strewn about, missing, or in the trash. Ms. Romero was often present in the locker room when these incidents occurred, yet when Ms. Jandali inquired about her missing

equipment, Ms. Romero would feign ignorance while audibly laughing as Ms. Jandali searched for her belongings.

22.     On one occasion, after Ms. Jandali again informed Ms. Romero that she was coming to work to find her boots and hard hat in the trash, Ms. Romero callously stated she threw them out because she believed they belonged to new hires. This explanation was demonstrably false, as the hard had she possessed was red, which was for management and support staff, whereas new hire hard hats were gold. Moreover, Ms. Romero was fully aware of where Ms. Jandali consistently stored her equipment.

23.     If an employee needed additional equipment, they were required to obtain a slip from their supervisor authorizing the request, which would be charged to the employee. Not once did Ms. Romero authorize Ms. Jandali to obtain new equipment when hers went missing.

24.     Without proper equipment, Ms. Jandali was prohibited from taking new hires to the processing floor pursuant to safety protocols. When she told Ms. Romero that she could not go on the floor without equipment or a slip, Ms. Romero ordered her to clean instead. When Ms. Jandali explained that she lacked the proper protective equipment necessary to safely handle toxic cleaning chemicals, Ms. Romero ordered her to proceed anyway, intentionally exposing Ms. Jandali to chemical hazards. As a result, Ms. Jandali was forced to either locate alternative safety equipment from other sources or perform hazardous work without proper protection.

25.     Ms. Romero similarly harassed the two other classroom trainers who worked B Shift. Like Ms. Jandali, they were Muslim and immigrants, one from Somalia and the other from Myanmar. Ms. Romero similarly disparaged them and threw away their safety equipment.

26.     On December 1, 2023, Ms. Jandali submitted a formal grievance with union representative, Dahir Omar outlining Ms. Romero's discriminatory conduct and the hostile work environment she created.

27.     After learning of the shared experiences of discrimination and harassment faced by the three trainers, on December 18, 2023, Mr. Omar submitted a formal grievance on behalf of all three B Shift Classroom trainers, alleging the company was discriminating against them due to their race, color, religion, and national origin. It described the hostile work environment these trainers faced and that they were being subjected to disparate treatment related to workplace policies.

## B. FMLA Interference and Retaliation

28.     During the week of December 11, 2023, Ms. Jandali submitted an FMLA leave request to Human Resources Manager Daniel Bacerra Romero. The requested leave was to care for Ms. Jandali's father, who recently suffered heart failure and needed heart surgery. Ms. Jandali requested leave from December 26, 2023, to March 18, 2024.

29.     Mr. Bacerra Romero approved Ms. Jandali's FMLA leave on December 21, 2023, and she began her leave on December 26, 2023.

30.     On January 3, 2024, while Ms. Jandali was on approved leave, Ms. Romero terminated Ms. Jandali's employment, falsely claiming that no FMLA paperwork was received or approved and that Ms. Jandali had no-called/no-showed for three days.

31.     After union representative Mr. Omar submitted a grievance with supporting documentation of Ms. Jandali's approved leave, Human Resources reinstated Ms. Jandali's

employment on January 8, 2024, claiming they did not have her paperwork, despite the documented email trail proving otherwise.

32.    Ms. Jandali was allowed to complete her FMLA leave and she returned to work on March 19, 2024.

### C. Systematic Retaliation Upon Return

33.    Upon returning from FMLA leave, Ms. Jandali discovered that she did not have access to email or other necessities, including login access to training materials, her online work drive, and trainer key access to classrooms and training rooms.

34.    Over the next two weeks, Ms. Jandali notified Human Resources Manager Nicolas Aguirre of the access issues, who told her he would look into it. She also called the IT Help Desk over twenty times.

35.    On April 11, 2024, Ms. Jandali followed up with Mr. Aguirre, stating she spoke with him previously about her access issues, it had been three weeks, and she still did not have access. She explained it limited her ability to perform her job and made her feel that she was being retaliated against for taking leave to care for her father. Ms. Jandali also noted how Ms. Romero discriminated and retaliated against her while on leave and she was still suffering from her unlawful actions. Ms. Jandali reiterated her request for Mr. Aguirre's help in resolving the issue.

36.    On April 12, 2024, Mr. Aguirre responded to Ms. Jandali, stating, "What is the issue that you need resolved? We have moved on from Hannah [Romero] twice now."[1] Denying any

---

[1] Ms. Jandali returned from leave to find Ms. Romero was relocated to a different area of the facility. It is unclear whether Ms. Romero was disciplined. She was permitted to retain the same or equal position, continues to work for Defendant, and has since been promoted.

discrimination was at play, he stated the issue with Ms. Romero was that the FMLA paperwork was not submitted and she did not know where Ms. Jandali was. He stated he would contact the Help Desk to see what was going on to get it fixed.

37.    On April 12, 2024, Ms. Jandali talked with an IT Helpdesk employee who checked the tickets created for her account. It showed Ms. Jandali's network account was disabled on March 22nd. On March 25th, it showed "AD account disabled," and on March 26th, it showed "User needs network access." It further noted, "User has called the help desk more than 20 times since then. There is an ERM request created since March 26th, and still not being approved by the Manager."

38.    On April 19, 2024, Mr. Aguirre emailed Ms. Jandali to inform her that he contacted corporate to approve the request and was waiting for a response. He claimed that because Ms. Jandali was an hourly employee, her requests went to the General Manager and it appeared it was lost in the shuffle.

39.    Ms. Jandali did not regain access to her email system until May 1, 2024, nearly six weeks after her return from leave. Even after regaining full access, all of her prior emails with years of accumulated training information was deleted. She contacted Mr. Aguirre and her supervisor, training manager Timothy Yantz Jr., who forward the inquiry to IT. IT stated they could not retrieve her old emails, but the documents on her work drive were still preserved.

### D.  Ms. Jandali Blew the Whistle on JBS Demands to Falsify Safety Records

40.    Pursuant to health and safety regulations, production employees were required to complete 100% of their safety trainings before working on the meatpacking floor.

41.    Throughout Ms. Jandali's employment at JBS, supervisors routinely put production employees to work on the floor when they had not completed all required safety training.

42.    Many production employees were non-English speakers who needed interpreters to understand and complete the trainings. While Ms. Jandali could translate and interpret for French and Arabic-speaking employees on her shift, this was highly insufficient to address the language needs for trainings across shifts.

43.    Despite this well-known reality, JBS offered no meaningful process to obtain additional interpreters when needed. Instead, when Ms. Jandali raised these language barrier issues, she was repeatedly told by her supervisors that facilitating training completion was her job, and if employees were not achieving 100% completion, then this was not the job for her. Supervisors emphasized that the training completion rates "need to be 100%" with warnings of consequences should they not be.

44.    While there was always pressure from management to meet production quotas, the company's demands became more aggressive and unreasonable over time, and the pressure on trainers intensified. Supervisors frequently put production employees on the floor when they had not fully completed all training, disapproved when more time was needed for training completion, and expressed upset when employees were not at 100% completion despite their full knowledge of language barriers and other training obstacles that prevented legitimate completion.

45.     On May 1, 2024, Training Managers Horacio Meza-Martinez and Fernando Casanova requested Ms. Jandali falsify training records for absent employees by marking them as complete when they were absent and had not attended the trainings.

46.     Ms. Jandali objected and explained that production employees were suffering serious injuries, including losing limbs, and safety protocols needed to be followed. Her concerns were completely ignored and met with repeated reminders that the records needed to be at 100% completion.

47.     On May 3, 2024, Ms. Jandali reported these unlawful practices to Mr. Aguirre and General Manager Manlio Medellin. She described the practice of supervisors and managers handing her a list of classes to complete on behalf of their production employees, even when employees were not physically present in class. She explained that on May 1st, when she refused supervisor Meza's request and stated the employees must attend the training to complete their courses, he became upset and told her that he would take her to Human Resources. She further explained that shortly after the interaction, supervisor Fernando Casanova came in demanding the same, and she likewise told him that the employees needed to finish the classes themselves and that doing classes on their behalf was not acceptable. Ms. Jandali reiterated that many employees did not speak English and needed an interpreter to understand safety procedures, and she believed completing the courses for them was unethical.  She did not receive a response to this email.

48.     On May 8, 2024, Ms. Jandali spoke with Superintendent and Slaughter Manager Mario Rayo in his office about these concerns. Mr. Rayo told her they needed to work together

to get people to 100%. He then said he spoke to supervisor Yantz and if Ms. Jandali did not get employees to 100%, she will receive a write up and lose her job.

49.    On May 9, 2024, Ms. Jandali emailed Mr. Aguirre to explain her ongoing concerns and described the May 8th encounter with Mr. Rayo. She stated Mr. Rayo was threatening and made her feel powerless and humiliated. Ms. Jandali again expressed her belief that such demands were illegal and unethical and that safety must be prioritized. She stated these were longstanding concerns that were not being addressed and asked for Mr. Aguirre's help to resolve them. She again received no response.

50.    On May 16, 2024, Mr. Meza confronted Ms. Jandali in the breakroom insisting Ms. Jandali mark classroom completion on behalf of his floor employees, however Ms. Jandali refused. The next day, Mr. Meza again confronted Ms. Jandali about getting his employees to 100% and said that by not doing so, it was negatively impacting his performance. He stated other trainers completed the classes for him and asked why she was refusing. She again explained the concerns to employee safety and legal compliance, however Mr. Meza continued with his insistence. When she told Mr. Meza that his workers needed to take the classes and because most of his employees did not speak English, it would be beneficial to send interpreters, Mr. Meza laughed and said, "I don't have an English center to send them to, just get them done." Shortly thereafter, at 1:30 a.m., Mr. Meza texted Ms. Jandali with a list of employees he wanted her to pass. Ms. Jandali against refused.

51.    On May 17, 2024, Ms. Jandali reported in detail the prior day's interaction with Mr. Meza to Mr. Aguirre and Mr. Medellin. She explained the how the constant demands and

pressure by supervisors and upper management were taking a toll on her and her belief that this conduct was illegal, unsafe, and unfair. She again requested their assistance in resolving these issues.

52.     On May 20, 2024, rather than conducting a proper investigation of Plaintiff's safety complaints, General Manager Medellin confronted Ms. Jandali about her complaints in front of the very supervisors she had reported for violating safety regulations. Without notice, Ms. Jandali was brought into a room with Mr. Medellin, Mr. Meza, Mr. Rayo, Mr. Yantz, and her union representative Mr. Omar. Mr. Medellin questioned Ms. Jandali about the safety violations she reported, asking for examples, names, clarification, and evidence. Despite the extremely inappropriate and intimidating environment created by management, Ms. Jandali answered Mr. Medellin's questions, provided numerous examples involving the supervisors in the room, and the facts supporting them.

53.     During the meeting, Ms. Jandali described the conversation she had with Mr. Rayo on May 8th where he referenced talking with Mr. Yantz and threatened her job. In response, Mr. Yantz did not deny or dispute her account. He instead chimed in to clarify that he was not present when Mr. Rayo made those statements to Ms. Jandali and did not make those kinds of statements to Ms. Jandali.

54.     Mr. Medellin then asked Mr. Meza whether he had a response to Ms. Jandali's allegations. Mr. Meza replied that he was simply pointing out to Ms. Jandali who was not at 100% and asking her why they were not finished. Ms. Jandali bravely responded to Mr. Meza directly, explaining that was not true and that Mr. Meza told her directly to finish the classes for specific

individuals. Mr. Meza again obfuscated his demands and stated he was simply inquiring about the incompletes.

55.     Mr. Medellin stated it was now on him to decipher who was or was not lying. He asked to see Ms. Jandali's proof. Mr. Omar chimed in to explain that he could obtain statements corroborating Ms. Jandali's allegations because these concerns had been raised to him before and he himself submitted grievances on behalf of employees regarding the same. Mr. Medellin and Mr. Yantz immediately discouraged him from doing so, stating it would create separate investigations and cause delay. When the meeting concluded, Ms. Jandali sent Mr. Medellin her evidence as requested.

56.     On May 21, 2024, Ms. Jandali emailed Mr. Medellin with Mr. Aguirre and Mr. Omar copied. She explained that shortly after the May 20th meeting, she noticed that someone was completing classes on behalf of a specific production employee, G.R., while recording Ms. Jandali as the facilitator/instructor, with class date and time entries of 5/20/2024 at 10:18 a.m. Ms. Jandali attached a screenshot showing this record. She told Mr. Medellin that neither she nor G.S. were working at that time and she started her shifts at 2:00 p.m. She raised concerns that someone was falsifying training records and using her name, at a time when she was not even on-site, and the unlawful and serious issue this posed.

57.     On May 22, 20254, Mr. Medellin responded to Ms. Jandali thanking her and stating the matter was still being investigated.

**E.   Ms. Jandali Faced Severe and Ongoing Retaliation**

58.     On May 28, 2024, Ms. Jandali arrived at work to find her workplace locker damaged, with the corner bent and unable to close properly. She found her Tasbih (Islamic prayer beads) in the trash, along with her other personal belongings.

59.     Ms. Jandali was horrified, deeply hurt, and feared for her safety. She went to Human Resources and made a complaint to representative Edmond Ebah, who assured her they would investigate the matter.

60.     Ms. Jandali did not hear from HR or anyone about the status of an investigation.

61.     On June 10, 2024, Ms. Jandali emailed Mr. Aguirre to follow up on her complaint to Mr. Ebah where her locker was damaged and property put in the trash. Mr. Aguirre responded, "I have not heard of issues or your name coming up. So, I hope it was a [sic] bad luck vs a retaliation situation. We will not accept that sort of behavior from management! Rest assure there. I will have some meeting and ensure everyone is on the same page." Ms. Jandali never received any follow up or resolution to this incident.

62.     On June 13, 2024, due to worsening depression, anxiety, and PTSD caused by JBS's retaliation and harassment, Ms. Jandali requested FAMLI leave for the period of June 17 to September 9, 2024.

63.     On June 14, 2024, Mr. Becerra Romero requested Ms. Jandali complete all FAMLI paperwork, which she completed and submitted in person that day.

64.     On June 17, 2024, Mr. Becerra Romero called Ms. Jandali and told her that he spoke with corporate and approved her to take leave while she waited approval from the Colorado FAMLI Division. Ms. Jandali started her leave that day.

65.     On July 5, 2024, Ms. Jandali received a call from Human Resources Representative Sylvia Rizo. Ms. Rizo told Ms. Jandali that if she did not return to work by July 12th, she would be terminated. Ms. Jandali explained that she was on medical leave which was approved by Mr. Becerra Romero. Ms. Rizo told Ms. Jandali that was not what she was seeing and she was supposed to be at work last week. She told Ms. Jandali she sent a letter to her home and she needed to return to work by the 12th or else she would be terminated.

66.     On July 9, 2024, the FAMLI Division notified Ms. Jandali that it denied her FAMLI benefits due to exhausting all leave time. Ms. Jandali timely appealed the decision.

67.     On July 12, 2024, Ms. Jandali received Ms. Rizo's stated letter in the mail which informed her that her FMLA/FAMLI leave was not approved because she did not turn in the required documentation on time or had exhausted all leave available. It further advised she must contact Human Resources immediately upon receiving the notice and no later than July 19th and failure to do so would result in termination.

68.     Upon redetermination, on July 17, 2024, the FAMLI Division approved Ms. Jandali's requested leave of June 17, 2024 to September 9, 2024. Ms. Jandali proceed on medical leave.

69.     On August 24, 2024, Ms. Jandali emailed Human Resources requesting an update on her previous complaints regarding the retaliation, hostile work environment, and safety concerns.

70.     JBS failed to respond to Ms. Jandali's request for an update on her multiple, unresolved complaints.

71.    Having endured months of unaddressed harassment, retaliation, and pressure to engage in illegal conduct, Ms. Jandali resigned on September 9, 2024.

72.    The harassment, discrimination, and retaliation she endured caused her to develop severe depression, anxiety, post-traumatic stress disorder, and debilitating physical symptoms including insomnia, frequent nightmares, inability to concentrate, and extreme fatigue. These conditions have transformed her from a vibrant, active, and outgoing person into someone who struggles with basic daily functioning and experiences profound emotional numbness. Ms. Jandali continues to require substantial medical treatment, including multiple medications and specialized therapies. The psychological trauma has resulted in a devastating loss of her former self and quality of life that continues to impact her daily.

## LEGAL CLAIMS

### COUNT 1
### Colorado Public Health Emergency Whistleblower Act
### C.R.S. § 8-2-127

73.    Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

74.    At all relevant times, Defendant was a "principal" within the meaning of C.R.S. § 8-14.4-102, and Plaintiff was a "worker" as defined by the statute.

75.    Plaintiff, in good faith, raised reasonable concerns about workplace violations of government health and safety rules to Defendant. Plaintiff reported that production employees were being forced to work without completing required safety training, that non-English

speaking workers were denied adequate safety instruction, and that supervisors were demanding falsification of safety records.

76.     Plaintiff's reports constituted reasonable concerns about significant workplace threats to public health and safety.

77.     Defendant controlled the workplace conditions giving rise to the health and safety threats and violations.

78.     These workplace health and safety violations created significant threats to worker safety, as evidenced by employees suffering serious injuries, including losing fingers and limbs.

79.     Plaintiff also opposed practices that she reasonably believed were unlawful under C.R.S. § 8-14.4-102.

80.     In response to Plaintiff's opposition and protected activity, Defendant discriminated against, took adverse action against, and retaliated against Plaintiff by subjecting her to harassment, wrongful discharge, denial of work resources, sham investigations conducted in front of accused supervisors, vandalism of her personal property, severe harassment, and constructive discharge.

81.     Defendant's actions were taken with a willful and wanton disregard of Plaintiff's rights protected state law.

82.     As a direct and proximate result of Defendant's violations of the Colorado Public Health Emergency Whistleblower Act, Plaintiff suffered significant damages, including lost wages, compensatory damages, and non-pecuniary damages.

<u>COUNT 2</u>
**WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY**

## Colorado Common Law

83.     Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

84.     Colorado has a clearly mandated public policy protecting employees who report workplace safety violations, refuse to perform illegal acts, or engage in conduct that supports clear public policy.

85.     Defendant repeatedly directed Plaintiff to perform illegal acts as part of her work-related duties, demanding she falsify mandatory safety training records.

86.     These directed acts would violate specific federal and state statutes and regulations relating to workplace safety, public health, and accurate recordkeeping, including OSHA standards and other safety regulations.

87.     Plaintiff refused to perform these illegal acts directed by Defendant.

88.     Plaintiff was constructively discharged as a direct result of her refusal to perform these illegal acts directed by Defendant.

89.     Plaintiff also exercised important public rights and duties by reporting Defendant's illegal safety practices to management and refusing to participate in conduct that endangered worker safety.

90.     Defendant retaliated against Plaintiff for exercising these public rights and duties, ultimately forcing her constructive discharge.

91.    Defendant had actual knowledge that Plaintiff's refusal to falsify safety records and reports of violations were based on her reasonable belief that such conduct was illegal and would endanger worker safety.

92.    Defendant's constructive discharge of Plaintiff was directly caused by her refusal to perform illegal acts, her exercise of public rights and duties, and her conduct supporting clear public policy.

93.    Defendant's actions were taken with a willful and wanton disregard of clearly mandated public policy.

94.    As a direct and proximate result of her wrongful discharge in violation of public policy, Plaintiff suffered significant damages, including lost wages, compensatory damages, and non-pecuniary damages.

## COUNT 3
### DISCRIMINATION BASED ON RELIGION
### Title VII of the Civil Rights Act of 1964
### 42 U.S.C. §§ 2000e

95.    Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

96.    Plaintiff is a member of a protected class under Title VII based on her religious identity and practices as a Muslim woman.

97.    Defendant subjected Plaintiff to discrimination and severe harassment on the basis of her religion, including the use of religious slurs, destruction of work equipment, and vandalism of her Islamic prayer beads.

98.     This religious harassment was sufficiently severe and pervasive to create a hostile work environment that altered the terms and conditions of Plaintiff's employment.

99.     Defendant knew of the harassment and failed to take prompt and effective remedial action.

100.    These adverse employment actions occurred under circumstances giving rise to an inference of discrimination based on Plaintiff's religion.

101.    Defendant's actions were taken with a willful and wanton disregard of Plaintiff's rights protected under Title VII.

102.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff suffered significant damages, including lost wages, compensatory damages, and non-pecuniary damages.

## COUNT 4
### DISCRIMINATION BASED ON RACE, COLOR, ETHNICITY, AND NATIONAL ORIGIN
### Title VII of the Civil Rights Act of 1964
### 42  U.S.C. §§ 2000e

103.    Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

104.    Plaintiff is a member of protected classes under Title VII on the basis of race, color, ethnicity, and national origin as a Moroccan immigrant and Brown woman.

105.    Defendant subjected Plaintiff to adverse employment actions including ethnic slurs, severe and pervasive harassment, denial of work resources, vandalism of her property, discharge, and constructive discharge.

106.    This harassment was sufficiently severe and pervasive to create a hostile work environment that altered the terms and conditions of Plaintiff's employment.

107.    Defendant knew or should have known of the harassment and failed to take prompt and effective remedial action.

108.    These adverse employment actions occurred under circumstances giving rise to an inference of discrimination based on Plaintiff's race, color, ethnicity, and national origin.

109.    Defendant's actions were taken with a willful and wanton disregard of Plaintiff's rights protected under Title VII.

110.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff suffered significant damages, including lost wages, compensatory damages, and non-pecuniary damages.

<u>COUNT 5</u>
**RETALIATION**
**Title VII of the Civil Rights Act of 1964**
**42  U.S.C. §§ 2000e**

111.    Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

112.    Plaintiff engaged in protected activity under Title VII by repeatedly raising complaints with human resources, supervisors, and management objecting to discriminatory treatment and filing grievances and complaints regarding such discrimination and harassment based on her and others' national origin, ethnicity, race, and religion.

113.    In response to Plaintiff's protected activity, Defendant subjected Plaintiff to increasing, materially adverse employment actions including harassment, discharge while on protected leave, denial of work access, destruction of personal property, and constructive discharge.

114.    Defendant's actions were taken with a willful and wanton disregard of Plaintiff's rights protected under Title VII.

115.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff suffered significant damages, including lost wages, compensatory damages, and non-pecuniary damages.

<u>COUNT 6</u>
**DISCRIMINATION BASED ON RACE, COLOR, ETHNICITY, AND NATIONAL ORIGIN**
**Colorado Anti-Discrimination Act**
**C.R.S. § 24-34-402**

116.    Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

117.    At all relevant times, Defendant was an employer covered by CADA.

118.    Plaintiff is a member of protected classes under CADA on the basis of race, color, ethnicity, and national origin as a Moroccan immigrant and Brown woman.

119.    Plaintiff was qualified for her position and performed her job duties competently and professionally at all relevant times.

120.    Defendant subjected Plaintiff to adverse employment actions including severe and pervasive harassment, denial of work resources, vandalism of her property, discharge, and constructive discharge.

121.    This harassment was sufficiently severe and pervasive to create a hostile work environment that altered the terms and conditions of Plaintiff's employment.

122.    Defendant knew or should have known of the harassment and failed to take prompt and effective remedial action.

123.    These adverse employment actions occurred under circumstances giving rise to an inference of discrimination based on Plaintiff's race, color, ethnicity, and national origin.

124.    Defendant's actions were taken with a willful and wanton disregard of Plaintiff's rights protected under CADA.

125.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff suffered significant damages, including lost wages, compensatory damages, and non-pecuniary damages.

<u>COUNT 7</u>
**DISCRIMINATION BASED ON RELIGION**
**Colorado Anti-Discrimination Act**
**C.R.S. § 24-34-402**

126.    Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

127.    Plaintiff is a member of a protected class under CADA based on her religion of Islam.

128.    Defendant subjected Plaintiff to discrimination and severe harassment on the basis of her religion, including the use of religious slurs, destruction of work equipment, and vandalism of her Islamic prayer beads.

129. This religious harassment was sufficiently severe and pervasive to create a hostile work environment that altered the terms and conditions of Plaintiff's employment.

130. Defendant knew or should have known of the harassment and failed to take prompt and effective remedial action.

131. These adverse employment actions occurred under circumstances giving rise to an inference of discrimination based on Plaintiff's religion.

132. Defendant's actions were taken with a willful and wanton disregard of Plaintiff's rights protected under CADA.

133. As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff suffered significant damages, including lost wages, compensatory damages, and non-pecuniary damages.

**COUNT 8**
**RETALIATION**
**Colorado Anti-Discrimination Act**
**C.R.S. § 24-34-402**

134. Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

135. Plaintiff engaged in protected activity under CADA by repeatedly raising complaints with human resources, supervisors, and management objecting to her discriminatory treatment and filing grievances and complaints regarding discrimination and harassment based on hers and others' protected characteristics.

136. In response to Plaintiff's protected activity, Defendant subjected Plaintiff to increasing, materially adverse employment actions including harassment, discharge while on

protected leave, denial of work access, destruction of personal property, and constructive discharge.

137.    Defendant's actions were taken with a willful and wanton disregard of Plaintiff's rights protected under CADA.

138.    As a direct and proximate result of Defendant's discriminatory conduct, Plaintiff suffered significant damages, including lost wages, compensatory damages, and non-pecuniary damages.

## COUNT 9
### INTERFERENCE AND RETALIATION
### Family and Medical Leave Act
### 29 U.S.C. § 2615

139.    Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

140.    At all relevant times, Defendant was an employer covered by the FMLA.

141.    Plaintiff was an eligible employee under the FMLA, having been employed by Defendant for more than twelve months and having worked at least 1,250 hours during the twelve-month period preceding her leave.

142.    Plaintiff properly requested and was granted FMLA leave to care for her father following his heart surgery, a qualifying serious health condition under the FMLA.

143.    Despite approving Plaintiff's FMLA leave, Defendant interfered with Plaintiff's FMLA rights by terminating her employment on January 3, 2024, while she was on protected leave, falsely claiming that no FMLA paperwork was received or approved.

144.    Only with the help of Plaintiff's union representative did Defendant reinstate Plaintiff, however, upon reinstatement, Defendant retaliated against Plaintiff by denying her access to her email and work materials for weeks, refusing to provide a received classroom key, and deleting all of her emails, thereby limiting her ability to perform her work.

145.    Defendant's discharge of Plaintiff while on job-protected leave and continued obstruction of her workplace access interfered with, restrained, and/or denied the exercise of her FMLA rights.

146.    Defendant retaliated against Plaintiff for exercising her FMLA rights when, upon reinstatement, it subsequently denied her access to essential work resources upon her return.

147.    Defendant's actions were taken with a willful and wanton disregard of Plaintiff's rights protected under the FMLA.

148.    As a direct and proximate result of Defendant's interference with Plaintiff's FMLA rights, Plaintiff suffered damages, including lost wages, emotional distress, and other compensatory damages.

<u>COUNT 10</u>
42 U.S.C. § 1981
Race Discrimination

149.    Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

150.    At all relevant times, Plaintiff performed her job effectively and satisfactorily.

151.    Plaintiff is a member of protected classes under 42 U.S.C. § 1981 on the basis of race, color, and ethnicity as a Moroccan immigrant and Brown woman.

152.    Plaintiff's employment relationship with Defendant encompassed sufficient contractual rights to support a Section 1981 claim for discrimination.

153.    Defendant denied Plaintiff the protections against race discrimination provided by Section 1981 in the terms and conditions of her employment by denying her the same benefits, privileges, and terms and conditions of her contractual employment relationship that her white counterparts enjoyed by, including but not limited to, subjecting Plaintiff to adverse employment actions including severe and pervasive harassment, denial of work resources, vandalism of her property, discharge, and constructive discharge.

154.    This harassment was sufficiently severe and pervasive to create a hostile work environment that altered the terms and conditions of Plaintiff's employment.

155.    Defendant knew or should have known of the harassment and failed to take prompt and effective remedial action.

156.    Plaintiff's race and ethnicity were but-for causes of Defendant's adverse actions against Plaintiff.

157.    Defendant's actions were taken with a willful and wanton disregard of Plaintiff's rights protected under Section 1981.

158.    As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights, Plaintiff has sustained substantial damages, including lost wages, lost future opportunities, humiliation, degradation, emotional distress, and other economic and consequential damages.

### COUNT 11
### 42 U.S.C. § 1981

## Retaliation

159.    Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

160.    At all relevant times, Plaintiff performed her job effectively and satisfactorily.

161.    Plaintiff is a member of protected classes under 42 U.S.C. § 1981 on the basis of race, color, and ethnicity as a Moroccan immigrant and Brown woman.

162.    Plaintiff's employment relationship with Defendant encompassed sufficient contractual rights to support a Section 1981 claim for retaliation.

163.    Plaintiff engaged in activities and speech opposing Defendant's discriminatory practices and reported her complaints and concerns of race-based discrimination to the union and HR.

164.    Because of Plaintiff's protected activity, Defendant subjected Plaintiff to increasing, materially adverse employment actions including harassment, discharge while on protected leave, denial of work access, destruction of personal property, and constructive discharge.

165.    Defendant's retaliation against Plaintiff was the direct and proximate cause of Plaintiff's substantial injuries, damages, and losses.

166.    Defendant's actions were taken with a willful and wanton disregard of Plaintiff's rights protected under Section 1981.

167.    As a direct and proximate result of said unlawful employment practices and in disregard of Plaintiff's rights, Plaintiff has sustained substantial damages, including lost wages,

lost future opportunities, humiliation, degradation, emotional distress, and other economic and consequential damages.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in her favor and against Defendant, and award her all relief as allowed by law, including, but not limited to:

a.    Declaratory relief and injunctive relief, as appropriate;

b.    Actual economic damages, including, but not limited to, front pay and back pay damages, as established at trial;

c.    Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d.    An award of punitive damages because Defendant engaged in intentional discrimination and has so done with malice or reckless indifference to Plaintiff's statutory rights;

e.    Pre-judgment and post-judgment interest at the highest lawful rate;

f.    Attorney's fees and costs; and

g.    Such further relief as justice requires.

**PLAINTIFF SALIMA JANDALI HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 21st day of November, 2025.

TYRONE GLOVER LAW, LLC

/s/ Helen Oh

Helen Oh
Tyrone Glover
Genevieve Mesch
2590 Walnut Street
Denver, CO 80202
W: 303-577-1655
F: 303-446-9400
Helen@tyroneglover.com
Tyrone@tyroneglover.com
Genevieve@tyroneglover.com
Attorneys for Plaintiff